MLW ASSOCIATES, INCORPORAT-
ED, A Michigan Corporation,
Plaintiff–Appellant,

v.

CERTIFIED TOOL & MANUFACTUR-
ING CORPORATION, an Illinois Cor-
poration, Defendant–Appellee.

No. 02–2150.

United States Court of Appeals,
Sixth Circuit.

July 6, 2004.

Rehearing En Banc Denied Sept. 9, 2004.

John C. Louisell, Michael F. Wais, Kar-
en A. Chopra, Timmis & Inman, Detroit,
MI, for Plaintiff–Appellant.

Michael D. Sher, Neal, Gerber & Eisen-
berg, Chicago, IL, Barry A. Seifman, Bar-
ry A. Seifman Assoc., Farmington Hills,
MI, for Defendant–Appellee.

Before KEITH and CLAY, Circuit
Judges; and OBERDORFER, District
Judge.*

CLAY, Circuit Judge.

This is a diversity action brought pursu-
ant to 28 U.S.C. § 1332(a), in which Plain-
tiff appeals the district court's orders de-
nying Plaintiff's motion to enforce the
terms of a settlement agreement and fur-
ther denying Plaintiff's motion for recon-
sideration of the order denying Plaintiff's
motion to enforce the settlement agree-
ment. Plaintiff contends that the district

* The Honorable Louis F. Oberdorfer, United
States District Judge for the District of Co-
lumbia, sitting by designation.

court erred in its application of contract interpretation principles under Michigan law concerning the terms of the settlement agreement entered into by Plaintiff and Defendant. For the reasons set forth below, we AFFIRM the district court's orders.

## BACKGROUND

### Procedural History

On January 13, 1999, Plaintiff filed a complaint in the Eastern District of Michigan against Defendant for breach of contract, unjust enrichment, quantum meruit, and promissory estoppel. Plaintiff sought declaratory relief, actual damages, as well as damages pursuant to Michigan's Sales Representative Statute. *See* MICH. COMP. LAWS § 600.2961 (2004). On March 4, 1999, Defendant filed its answer to Plaintiff's complaint, denying most of the allegations made by Plaintiff. After some negotiations to avoid litigation, the parties entered into a settlement agreement ("Agreement") on September 22, 1999. The district court then dismissed the case with prejudice, but retained jurisdiction with authority to reinstate the case should any of the parties fail to comply with the Agreement.

In a May 3, 2000 letter. Plaintiff advised Defendant that the latter was not in compliance with the terms of the Agreement because it was late in paying commissions to Plaintiff and in submitting relevant business information. The parties continued to exchange correspondence concerning the underpayment of commissions and absence of documentation. On May 14, 2001, the district court held a settlement conference, but no transcript was taken of the conference. Approximately two months later, on July 11, 2001. the district court entered an order extending time for Plaintiff to file a motion to enforce the Agreement.

On September 10, 2001. Plaintiff filed a motion to enforce the Agreement asserting that Defendant breached its obligation under the Agreement by failing to pay Plaintiff its 3.25% commission on Defendant's net sales of certain "Parts" in the contract.[1] Defendant filed its response to Plaintiff's motion to enforce the Agreement on December 4, 2001. Plaintiff then filed a reply to Defendant's response, reiterating the arguments it made in its motion to enforce the Agreement and requesting an evidentiary hearing to demonstrate Defendant's non-compliance with the Agreement. On February 4, 2002, the district court held a motion hearing as requested by Plaintiff and took the matter under advisement. The district court ultimately denied Plaintiff's motion to enforce the Agreement on February 13, 2002.

On March 12, 2002, Plaintiff filed its motion for reconsideration of the district court's February 13, 2002 order, arguing that the Agreement should have been interpreted in its favor. The district court denied Plaintiff's motion for reconsideration, but purportedly disagreed with both parties' interpretation of the Agreement. Under the court's interpretation of the Agreement, Defendant had already paid all commissions to Plaintiff for which it was responsible under the Agreement. Plaintiff now appeals, contending that the district court erred in its interpretation of the Agreement.

### Facts

The facts are taken from the record before the district court. Plaintiff MLW

---

**1.** Apparently, the term "Parts" refers to automotive components that were manufactured in the course of Defendant's business.

Associates, Inc., is a Michigan corporation engaged in the business of serving as a sales representative for manufacturers. Defendant Certified Tool & Manufacturing is an Illinois corporation engaged in the business of manufacturing automotive parts and related products. In the early 1980s, the parties entered into a contract, the terms of which are not in dispute, that made Plaintiff the exclusive automotive sales representative for Defendant in North America. The terms of the contract provided that in "exchange for the work and services to be performed by [Plaintiff] in promoting and selling [Defendant's] parts, [Plaintiff] would receive commissions on all sales of parts and/or customer [sic] where [Plaintiff] was the procuring cause of those sales, for all orders and renewals thereof, as well as for the life of the part or program or customer so procured by [Plaintiff] for [Defendant]." (J.A. at 8). Plaintiff's complaint further states that Defendant agreed to pay Plaintiff "3.25% of the selling price upon all sales of parts or goods to customers" of Defendant. (J.A. at 8). Over the years of their relationship, Plaintiff marketed Defendant's parts and was "the procuring cause of many purchase orders and customers" on Defendant's behalf. (J.A. at 8).

In August of 1998, Defendant unilaterally terminated its relationship with Plaintiff, but admitted that it was still obligated to pay Plaintiff commissions in connection with sales of parts pursuant to purchase orders for which Plaintiff was a procuring cause. In its pleading, Plaintiff asserts that it was the procuring cause of all future sales of certain goods for Defendant, "including but not limited to those [Parts] identified in Exhibit A." (J.A. at 9). In its responsive pleading, Defendant denied that it had an obligation to pay Plaintiff "commissions in connection with all sales to customers to which sales of certain parts have been procured rather than in connection with the sale of said parts." (J.A. at 52). As recounted above, on September 22, 1999, the parties entered a settlement agreement ("Agreement") under the aegis of the district court "solely to avoid the expense and inconvenience of further litigation." (J.A. at 57). Under the Agreement, Defendant would make certain payments in accord with the following terms:

(1) [Defendant] shall continue to pay [Plaintiff] a commission fee equal to three and one-quarter (3.25%) of "net sales by [Defendant]" as the term "net sales" has been defined and adopted by the parties by their past actions, of the parts identified on Exhibit A hereto (the "Parts"), any successor part to a Part (also a "Part"), and/or any other part number identifying a Part (also a "Part") the sale of which was procured by Plaintiff, payable as hereinafter set forth. . . .

(2) [Defendant] shall keep and maintain accurate books of account and records with respect to sales of the Parts, and shall provide [Plaintiff] copies of books of account and records, including all customer releases, invoices, credit memoranda and shipping memoranda related to all sales of the Parts with each calendar quarter commission payment reflecting the previous calendar quarterly sales.

(3) Upon execution of this Agreement, [Defendant] shall pay to [Plaintiff] Fifty thousand Dollars ($50.000.00) to compensate [Plaintiff] for legal and other related costs incurred by [Plaintiff] to pursue its claim. Within ten (10) business days of payment by [Defendant] to [Plaintiff] of the sum of fifty Thousand Dollars ($50,000.00).

(J.A. at 56). In return for the above stipulation, Plaintiff agreed to dismiss the re-

mainder of its claims against Defendant as follows:

(1) [Plaintiff] shall take such steps as are necessary to dismiss the Action with prejudice. [Plaintiff] shall obtain such dismissal with prejudice and shall furnish [Defendant] with a copy of the order reflecting such dismissal with prejudice by delivering a copy thereof to Michael D. Sher and Barry A. Seifman, [Defendant's] counsel in the Action. This dismissal with prejudice, however, is and shall remain in effect only as long as [Defendant] remains in full compliance with the terms of this Agreement.

(2) Upon [Defendant's] failure to comply with any of the terms and conditions of this Agreement, within ten (10) days following notice by [Plaintiff], [Plaintiff] may file with the Court the attached executed Stipulated Order to Set Aside (Exhibit B) and the Consent Judgment (Exhibit C).

(J.A. at 56–57). The consent judgment entered by the district court ordered the terms and conditions in the Agreement be adopted and confirmed as the judgment of the court and further ordered that "this Court shall retain jurisdiction of this matter to enforce the terms and conditions of this Judgment, if necessary, until such time as the parties have fully complied with the terms of the Judgment, or until further order of this Court." (J.A. at 42).

Shortly after the parties signed the Agreement, a dispute arose regarding payment of commissions pursuant to paragraph one of the Agreement. Plaintiff notified Defendant that the latter had not provided documentation for the fourth quarter calendar year for the sales of "Parts" and was late in sending the commission payment for the first quarter of 2000. In a series of letters exchanged by the parties from May of 2000 through July of 2000, Plaintiff insisted that Defendant was not reporting all sales procured by Plaintiff, and therefore was not paying all the commissions due Plaintiff. In August of 2000. Defendant stated, by letter, its understanding that commissions it paid to Plaintiff were due only on sale of parts listed in Exhibit A of the Agreement.

In a letter dated August 23, 2000, Plaintiff responded to Defendant's assertion that it was only responsible for paying commissions on parts listed in Exhibit A by inviting Defendant to review paragraph one of the Agreement, which delineated the meaning of the term "Parts," for which Plaintiff procured sales. Plaintiff acknowledged that Defendant was probably not paying commissions on certain parts "apparently because of their inadvertent omission from Exhibit A." (J.A. at 168). Plaintiff claims (inaccurately) that it was not until March of 2001 that Defendant formally asserted that paragraph one of the Agreement required Defendant to make commission payments only on parts of successor parts listed in Exhibit A, "totally ignoring the procurement clause of the Agreement modifying the third category of 'any other part number identifying a Part.'" (Plaintiff's Br. at 14). A settlement conference did not resolve the dispute between the parties and Plaintiff filed a motion with the district court to enforce the terms of the Agreement.

According to Plaintiff, the Agreement provided for payment for three categories of parts, viz., "(1)the parts identified on Exhibit A hereto (the 'Parts') (category one), (2) any successor part to a Part (also a 'Part') (category 2), (3) and/or any other part number identifying a Part (also a 'Part') the sale of which was procured by [Plaintiff] (category three), payable as hereinafter set forth." (Plaintiff's Br. at 15). In its motion seeking to enforce the Agreement, Plaintiff requested payment

for commissions due and owing in the amount of $45,229, and also requested an evidentiary hearing to provide proofs "relating to the sale of Parts both identified and procured" by Plaintiff. (J.A. at 46–48). In its response to Plaintiff's motion to enforce the Agreement, Defendant argued that Plaintiff sought to "reform," and not enforce, the Agreement. Defendant argued that it was required to pay commissions to Plaintiff only on "sales of automotive parts defined as 'Parts'" in the Agreement. (Defendant's Br. at 8). According to Defendant, the term "Parts" is defined in Exhibit A of the Agreement, and includes in its definition any of the 66 parts listed on Exhibit A. Plaintiff continued to contend, however, that the third category of "Parts" as defined in paragraph one of the Agreement was a "catchall" phrase for *any* parts procured by Plaintiff on behalf of Defendant, not just "Parts" listed in Exhibit A. (Plaintiff's Br. at 19) (emphasis added).

In its opinion denying Plaintiff's motion to enforce the terms of the Agreement, the district court reasoned that the language of the Agreement was "plain and unambiguous." (J.A. at 251). The court found that paragraph one of the Agreement defined "Parts" as "all parts identified on Exhibit A." (J.A. at 251). It further reasoned that Plaintiff's reading of the Agreement to include the phrase "any parts" obtained by Plaintiff "on behalf of [Defendant]" would negate the first two prongs of the Agreement, and render the definition of "Parts" in the Agreement "unnecessary surplusage." (J.A. at 252). Thus, the court reasoned that Plaintiff's reading of the Agreement improperly sought to reform the contract. Addition-

ally, the court found that parts listed on Exhibit B. C and D are "Parts" as defined under paragraph one of the Agreement to the extent that those parts are listed as one of the "Parts" in Exhibit A, successor parts to the parts listed on Exhibit A, or a "Part" identified by any other part pursuant to the Agreement. (J.A. at 254). Finally, the court reasoned that, because Defendant paid all the commissions due Plaintiff, Plaintiff's motion to enforce the Agreement must be denied. In its opinion denying Plaintiff's motion for reconsideration, the district court rejected both parties' interpretations of the Agreement, instead opting to define the Agreement under Michigan contract law principles.[2]

## DISCUSSION

This Court reviews a district court's substantive decision to enforce or deny enforcement of a settlement agreement under an abuse of discretion standard. *Therma–Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 418 (6th Cir.2000) ("we join with ... other circuits and hold that the abuse of discretion standard is the proper guide for our review of a district court's decision to enforce a settlement agreement"). A district court's factual findings in regard to a settlement agreement is reviewed under the clearly erroneous standard. *See id.* at 419. Because this case is in federal court on diversity jurisdiction grounds, this court must interpret "the unambiguous language [in a settlement agreement] in its plain and easily understood sense" pursuant to the applicable state law governing the issue. *Hidrofiltros, de Mexico, S.A. de C.V. v. Rexair, Inc.*, 355 F.3d 927, 930 (6th Cir.2004) (cita-

---

2. The court reasoned that under Michigan contract law, the terms of a settlement agreement are reviewed under contract law principles, and neither party's interpretation of the terms in the Agreement represents the intend-

ed purpose of the terms. This reasoning by the district court is curious, considering Defendant's position that "Parts" is a defined term in the Agreement mirrors the district court's position in this case.

tions omitted). The parties do not dispute that Michigan law is the applicable law governing this dispute. A federal court sitting in diversity must apply the law of the highest state court if that court has ruled on the matter in dispute, otherwise the court may rely on case law from lower state courts. *See Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506 (6th Cir.2003); *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 566 (6th Cir.2001); *Talley v. State Farm Fire & Cas. Co.,* 223 F.3d 323, 326 (6th Cir.2000)(citing *Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178 (6th Cir.1999)). Because Michigan law determines that the construction of a contract is a legal question, the terms of a contract should be reviewed *de novo. See Zurich Ins. Co. v. CCR & Co.,* 226 Mich. App. 599, 576 N.W.2d 392, 395 (1997).

Although Plaintiff presents many arguments for this Court's consideration, the single dispositive issue is whether the district court erred in interpreting the terms of the Agreement by rewriting the definitions of the three unambiguous categories of the term "Parts" in the Agreement. Under Michigan law, an agreement to settle a pending lawsuit is a contract and is reviewed by the legal principles applicable to contract construction and interpretation. *See Farm Bureau Mut. Ins. Co. v. Backallew,* 2004 WL 1161379 (Mich.Ct.App.2004); *In re Estate of Soria,* 2004 WL 345464 (Mich.Ct.App.2004); *Michigan Mut. Ins. Co. v. Indiana Ins. Co.,* 247 Mich.App. 480, 637 N.W.2d 232, 235 (Mich.Ct.App.2001). Of course, a settlement agreement is a contract between parties to forgo litigation so long as the terms of the agreement are honored by the parties. *See Bamerilease Capital Corp. v. Nearburg,* 958 F.2d 150, 152 (6th Cir.1992); *Herrnreiter v. Chicago Hous. Auth.,* 281 F.3d 634, 636 (7th Cir. 2002) ("settlement agreement is a contract"); *Augustine Med. Inc. v. Progressive Dynamics, Inc.,* 194 F.3d 1367, 1370

(Fed.Cir.1999) (finding settlement agreement is a contract). Under Michigan law, settlement agreements are favored and discovering the parties' intent in forming the contract should be the goal of courts interpreting such agreements. *See Eyde v. Eyde,* 2004 WL 1366007, at * 4 (Mich.Ct. App.2004); *Old Kent Bank v. Sobczak,* 243 Mich.App. 57, 620 N.W.2d 663, 666–67 (Mich.Ct.App.2000). It is well-settled law that in determining the intent of the parties to a contract, the terms in a contract should be given their plain ordinary meaning. *See Bandit Indus., Inc. v. Hobbs, Int'l, Inc.,* 463 Mich. 504, 620 N.W.2d 531, 533 (Mich.2001); *Rasheed v. Chrsyler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 24 (Mich.1994); *Bianci v. Auto. Club of Mich.,* 437 Mich. 65, 467 N.W.2d 17 (Mich. 1991). A longstanding principle of contract construction announced by the Michigan Supreme Court close to fifty years ago provides that "[e]very word in [an] agreement must be taken to have been used for a purpose and no word should be rejected as surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer,* 346 Mich. 106, 77 N.W.2d 384, 386 (Mich.1956) (citation omitted).

Plaintiff contends that when the foregoing principles are applied to the instant case, it becomes apparent that the district court erred in interpreting the three categories of "Parts" that were etched in paragraph one of the Agreement and for which Plaintiff was entitled to a commission. The three categories of "Parts" in the Agreement for which Plaintiff was entitled to a commission included "(1) the parts identified on Exhibit A (the 'Parts') ... (2) any successor part to a Part (also a 'Part') ... (3) and/or any other part number identifying a Part (also a 'Part') the sale of which was procured by [Plaintiff]." (J.A.

at 29–30). Plaintiff argues that the district court erred in interpreting the term "Parts" as initially defined in the Agreement as all parts identified on Exhibit A, thus making Exhibit A Parts the only parts for which Plaintiff was entitled to a commission from Defendant under the Agreement. The district court interpreted paragraph one of the Agreement to mean that (1) the term "Part" is defined as all parts listed on Exhibit A; (2) any successor part to a Part is also a Part; and (3) any other part number identifying a Part, *the sale of which was procured by [Plaintiff]*, is a also a Part. (J.A. at 251–52) (emphasis added). Plaintiff's disagreement with the district court's opinion on this point stems from the former's interpretation of the italicized language as modifying all the three categories of "Parts" identified in paragraph one of the Agreement. Stated differently, Plaintiff believes the emphasized language requires that Defendant pay Plaintiff commissions on parts procured by Plaintiff, regardless of whether those parts were listed, or are related to parts listed, on Exhibit A.

Michigan law dictates that an unambiguous contract should be construed according to its "plain and easily understood" terms. *Rexair*, 355 F.3d at 930. Where a court determines ambiguity exists in a contract, Michigan law requires that a jury determine the terms of the contract. *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 455 (6th Cir.2003)(applying Michigan law); *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 663 N.W.2d 447, 459–460 (Mich.2003). A contract is considered ambiguous under Michigan law if its terms "reasonably may be understood in different ways." *Lyte v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 921 n. 2 (Mich.1998) (citing *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 412 Mich. 355, 314 N.W.2d 440, 441 (Mich.1982)). Ambiguity will not be found by a court solely because a party to the contract interprets terms differently than the express definition provided in the contract. *Wilkie v. Auto Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776, 786 (Mich.2003) ("[W]e decline defendants' invitation to discern ambiguity solely because an insured might interpret a term differently than the express definition provided in a contract"); *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 596 N.W.2d 915, 920 (Mich.1999). Technical or torturous constructions of a contract should be avoided under Michigan common law. *See Bianci*, 467 N.W.2d at 20 n. 1; *Cady v. Taggart*, 223 Mich. 191, 193 N.W. 848, 849 (Mich. 1923) (implying that technical interpretations of the terms in a contract are disfavored); *Schroeder v. Terra Energy, Ltd.*, 223 Mich.App. 176, 565 N.W.2d 887, 891 (Mich.Ct.App.1997) ("contractual language is interpreted according to the plain meaning of the language in the contract rather than a technical construction of the language").

Applying the foregoing tenets to the instant case, we are convinced that the district court appropriately interpreted Michigan law. Paragraph one of the Agreement does define the parts listed on Exhibit A as the "Parts." The two other categories in paragraph one refer to the term "Part," clearly referring to one of the 66 Parts listed on Exhibit A. To read the Agreement otherwise would render superfluous the reference to "Parts" listed on Exhibit A, and such a construction must be avoided under Michigan law. *See Bianci*, 467 N.W.2d at 20 n. 1; *Schroeder*, 565 N.W.2d at 891. Plaintiff contends that a "Part" is not the same as "Parts" and that any part procured by Plaintiff, regardless of whether it is listed on Exhibit A, is subject to commissions being paid Plaintiff under the plain definition of the Agreement. What Plaintiff

advocates, however, is a "technical" or "torturous" interpretation of the term "Parts," and such a construction is disfavored by Michigan law.[3] *See Bianci*, 467 N.W.2d at 20 n. 1; *Schroeder*, 565 N.W.2d at 891; *Cady*, 193 N.W. at 849. Moreover, embracing Plaintiff's interpretation of the Agreement would run contrary to Michigan's ensconced contract principle that "no word should be rejected as surplusage if the court can discover purpose thereof." *Baer*, 77 N.W.2d at 386. This is so because the term "Parts" is defined early in the Agreement to include those parts listed on Exhibit A. The additional language in paragraph one of the Agreement clarifies that successor parts or parts acquired by Plaintiff on Defendant's behalf are "Parts" if listed on or related to a part listed on Exhibit A. Plaintiff's reading of the Agreement to include *all* parts it acquired on behalf of Defendant, regardless of whether such a part is listed on Exhibit A, would render meaningless the first two sections in paragraph one. A party who forfeits his or her right to litigation by entering into an unambiguous settlement agreement may not change course and argue that such an agreement is ambiguous merely because that party failed to clearly negotiate the terms of the agreement. *See Hildrofilt-ros*, 355 F.3d at 930 (noting parties are bound by the plain terms of an unambiguous settlement agreement).

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's orders denying Plain-

tiff's motion to enforce the Agreement and Plaintiff's motion for reconsideration.

---

**3.** At oral argument, Plaintiff conceded that the district court would have to hold hearings to determine what the term "Parts" meant if Plaintiff's interpretation of the Agreement were accepted. This reasoning seems coun-terintuitive considering that the parties expressly entered the Agreement to avoid "the expense and inconvenience of further litigation." (J.A. at 57).